252 F.3d 63 (2nd Cir. 2001)
 IN RE: SCHOLASTIC CORPORATION SECURITIES LITIGATION
LAWRENCE B. HOLLIN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFF,
RICHARD TRUNCELLITO AND THE CITY OF PHILADELPHIA, APPELLANTS,
v.
SCHOLASTIC CORPORATION AND RAYMOND MARCHUK, DEFENDANTS-APPELLEES, RICHARD ROBINSON, DEFENDANT.
 Docket No. 00-7517
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: November 15, 2000
Decided June 1, 2001
 
 1
 Plaintiffs Richard Truncellito and the City of Philadelphia appeal from a judgment of the United States District Court for the Southern District of New York (Keenan, J.) entered January 31, 2000, which pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissed their second amended complaint alleging federal securities fraud.
 
 
 2
 Reversed and remanded.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 3
 Jeffrey A. Klafter, New York, New York (Bernstein Litowitz Berger & Grossmann, LLP, New York, New York; Stephen A. Whinston, Douglas M. Risen, Berger & Montague, P.C., Philadelphia, Pennsylvania, of counsel), for Appellants.
 
 
 4
 Michael J. Chepiga, New York, New York (Felecia L. Stern, Michael A. Berg, Simpson Thacher & Bartlett, New York, New York, of counsel), for Defendants-Appellees.
 
 
 5
 Before: Cardamone, Calabresi, Circuit Judges, and HAIGHT*, District Judge.
 
 Cardamone, Circuit Judge
 
 6
 On this appeal we construe a complaint in a securities fraud case brought by stockholders against a book publisher and one of its officers. It is the book publisher's practice to count as income the proceeds of any book it sells to a retailer or distributor, while at the same time granting to such buyers a full right of return. The number of returns is therefore critical to profitability in the publishing business because when returns occur the publisher not only has unsold inventory back on its hands, but, also, income it has previously declared never materializes.
 
 
 7
 Plaintiffs allege that during the class period defendants knew returns had increased significantly, and that this negative corporate development later precipitated a large loss and a steep plunge in the company's publicly traded stock. The company is said to track book returns on a monthly and weekly basis, and to have daily information available to it from other sources as well. But despite such data establishing an adverse trend, the company announced publicly that its return rates were running at normal levels.
 
 
 8
 Defendants maintain, in effect, that there are no allegations in the complaint that would support proofs of either false statements or a fraudulent intent. To the contrary, we think plaintiffs sufficiently allege an unusual business model which, if proven, ignored alarmingly high returns that function as an obvious straw to show which way the wind was blowing in this book business. They may also be able to prove that the defendant officer, represented to stock analysts to be a key spokesperson, cashed in 80 percent of his stock while disseminating information that the company was not experiencing financial difficulties. For a spokesperson to cash in his own stock can in appropriate circumstances be like a ship's captain exiting into the safety of a lifeboat while assuring the passengers that all is well. A jury could find defendants liable for such behavior if its existence were supported by sufficient evidence. As such, plaintiffs in our view have survived the pleading stage of this securities fraud litigation.
 
 BACKGROUND
 
 9
 Lawrence B. Hollin, individually and on behalf of all others similarly situated, began the instant class action securities fraud suit against defendant Scholastic Corporation, a book publishing company, and its officer Richard Robinson in the United States District Court for the Southern District of New York (Keenan, J.). The complaint asserted claims pursuant to § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b) (1994), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (2000), and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (1994).[1] A consolidated amended complaint was filed August 13, 1997 and dismissed on December 15, 1998 following a Rule 12(b)(6) motion brought by defendants, see In re Scholastic Corp. Sec. Litig., No. 99 Civ. 2447, 1998 WL 872422 (S.D.N.Y. Dec. 15, 1998), and the district court granted plaintiffs leave to amend.
 
 
 10
 On March 8, 1999 court-appointed lead plaintiffs Richard Truncellito and the City of Philadelphia filed a corrected second consolidated amended class action complaint. They named Scholastic and Raymond Marchuk, who serves as Scholastic's vice president for finance and investor relations, as defendants. The plaintiff class includes those persons who purchased Scholastic common stock during the class period and who sustained damages allegedly because defendants made materially false and misleading statements and concealed adverse facts regarding their publishing business, thereby causing plaintiffs to purchase the stock at artificially inflated prices.
 
 
 11
 Defendants in response filed another motion to dismiss under Rule 12(b)(6), arguing that plaintiffs failed to state a claim and failed to plead fraud with particularity, as required under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (Securities Reform Act), Pub. L. No. 104-67, 109 Stat. 737 (1995). The district court granted the motion. See In re Scholastic Corp. Sec. Litig.(Scholastic Corp.), No. 99 Civ. 2447, 2000 WL 91939 (S.D.N.Y. Jan. 27, 2000).
 
 
 12
 On appeal, we examine the factual allegations set out in plaintiffs' second amended complaint in some detail, assuming them, as we must, to be true. Novak v. Kasaks, 216 F.3d 300, 305 (2d Cir.), cert. denied, 121 S. Ct. 567 (2000).
 
 
 13
 A. Scholastic's Business and Its Operations Prior to the Class Period
 
 
 14
 Plaintiffs' allegations reveal that Scholastic is a leading publisher and distributor of children's books, classroom and professional magazines, and other educational products, which it sells through retail distributors, book clubs, book fairs, classrooms and libraries. In the years leading up to 1996-1997, Scholastic's best-selling product was "Goosebumps," a series of "scary" children's books. Prior to December 1996, defendants had expanded Goosebumps distribution to mass merchandisers and other non-traditional retailers. This change in strategy was presented to the public as a significant positive development.
 
 
 15
 What the public did not know was that Scholastic shipped books to retailers and distributors with a full right of return. In so doing, Scholastic could, under generally accepted accounting principles, record revenues upon shipment to the retailer so long as an adequate reserve provision existed for books that might be returned. In June 1996, Scholastic announced through a press release that it was adopting Statement of Accounting Standard 121, which requires a more frequent evaluation of inventory and a write-down when appropriate.
 
 
 16
 Prior to its change in distribution strategy, Scholastic boasted one of the lowest book return rates in the children's book publishing industry. On September 12, 1996 Merrill Lynch issued a report on Scholastic's return rates that incorporated statements made at a meeting with senior Scholastic officers that included defendant Marchuk. These officers represented that the company's return rate historically ran at 15 to 20 percent, as compared to 35 percent rates at other book publishers, Goosebumps books were being returned at even less than 20 percent, and while the expansion into the mass retail market could cause the return rate to rise, it would rise only "modestly." Scholastic officials added that "the issue of managing return exposure is one that gets considerable management attention." No one at Scholastic corrected this report when it appeared.
 
 
 17
 First quarter results, ending August 31, 1996, recorded a loss worse than had been experienced in the same quarter the previous year. Nevertheless, on September 19, 1996 Merrill Lynch issued another report derived from statements by company officials that Scholastic's "return rates remain among the lowest in the industry at less than 20%, which might suggest that Goosebumps has been somewhat underdistributed."
 
 
 18
 B. What Allegedly Occurred During the Class Period
 
 
 19
 The class period in this lawsuit begins on December 10, 1996, the day Scholastic issued a press release announcing a net income for the second quarter of the 1997 fiscal year, which ended November 30, 1996. The income represented a 24 percent increase over the comparable period for the prior year. The class period ends on February 20, 1997, when Scholastic issued another press release announcing an expected third quarter loss of 70 to 80 cents per share. Prior to this release, Scholastic had expressed "comfort" with income estimates of 64 to 73 cents per share. Scholastic's news of an expected loss also contrasted with estimates by stock analysts that Scholastic would realize a net income of approximately 69 cents per share. The February 20 press release stated further that Scholastic would take a $13 million pre-tax special charge consisting of a reserve for anticipated additional book returns. The next day, Scholastic stock fell 40 percent or $24.75 per share. Another $11 million special charge for book returns was taken in the following quarter. Industry analysts thereafter questioned the credibility of Scholastic management with respect to what officials knew and how long they had known it before Scholastic made the third quarter announcement.
 
 
 20
 What happened between the December 10, 1996 and February 20, 1997 press releases forms the basis for plaintiffs' lawsuit. Defendants are alleged to have disseminated false information, withheld damaging truthful information and failed to update prior public statements that had become materially misleading. In addition, defendant Marchuk is alleged to have sold a large percentage of his Scholastic stock within a week's time (starting at the end of 1996), and plaintiffs further claim that Marchuk influenced Scholastic's decision to disseminate false and misleading statements in ways that would cause him to be liable as a "controlling person" as that term is defined in § 20(a) of the Exchange Act.
 
 DISCUSSION
 
 21
 The grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed on appeal de novo. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000). Accepting all of the allegations in the complaint as true and drawing all reasonable inferences in favor of plaintiffs, see Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 534 (2d Cir. 1999), dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). To decide whether plaintiffs have sufficiently pled facts in support of their claims, we look to the elements of a securities fraud and a "controlling-person" liability claim.
 
 I. Section 10(b) Securities Fraud Claim
 
 22
 For a plaintiff to state a viable cause of action for securities fraud under § 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b- 5(b), the complaint must allege that in connection with the purchase or sale of securities, defendant, acting with scienter, either made a false material representation or omitted to disclose material information so that plaintiff -- acting in reliance either on defendant's false representation or its failure to disclose material information -- suffered injury and damages. See Rothman, 220 F.3d at 89. The Exchange Act, as amended by the Securities Reform Act also requires that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1) (1994 & Supp. V 1999).
 
 
 23
 Specificity is also required by the Federal Rules of Civil Procedure, which provide that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). The complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993).
 
 
 24
 A. False Material Representation or Failure to Disclose Material Information
 
 
 25
 In their complaint, plaintiffs identify specific statements or sets of statements believed to be materially false and misleading. The first is the press release issued by Scholastic on December 10, 1996, announcing its net income for the second quarter of the 1996-97 fiscal year.
 
 
 26
 The second set of statements arises out of a conference call with analysts the day after the press release was issued, in which defendant Marchuk is alleged to have participated. Merrill Lynch issued a report on December 12 stating that defendants emphasized that the "front list" of newer Goosebumps titles demonstrated strong growth and that any flattening of trade revenues was due to older titles. Although Merrill Lynch also reported defendants as saying the quarterly retail sales results were distorted and had suffered in comparison to the second quarter for the previous year, Deutsche Morgan Grenfell reported on December 13, 1996 that defendants continued to maintain that a 20 percent growth in Goosebumps retail sales was reasonable. Defendants received copies of these reports and made no corrections.
 
 
 27
 Third, plaintiffs point to the prospectus supplement issued by Scholastic on December 18, 1996 in connection with its sale of $125 million in notes, in which the company reported second quarter results and stated that "[t]rade sales remained constant from the prior year's strong second quarter performance." Profitable second quarter results were also reported in Scholastic's Form 10-Q filed on January 14, 1997.
 
 
 28
 Merrill Lynch issued another report on January 31, 1997, again based on discussions with senior Scholastic officials including Marchuk. These officials said no surge in book returns had occurred, which Merrill Lynch considered important since it viewed higher-than-expected returns as a significant stock risk after Scholastic initiated mass market distribution. Merrill Lynch raised its rating on Scholastic stock from neutral to accumulate. That recommendation caused Scholastic's stock to rise by $1.50 per share.
 
 
 29
 Following this report, Merrill Lynch contacted Scholastic in early February to inquire about return rates. Defendant maintained that returns were at "normal" levels, previously represented to be between 15 and 20 percent. Less than three weeks later, Scholastic issued its February 20 press release announcing expected losses for the third quarter.
 
 B. Trends Adequately Alleged
 
 30
 Pursuant to 17 C.F.R. § 229.303 (2000), promulgated by the Securities and Exchange Commission, defendants were required to disclose on Form 10-Q any known trends that would have or were reasonably likely to have a material impact on revenues. The trial court found the complaint had inadequately pleaded the existence of such trends and therefore found it failed to identify false or misleading statements. Scholastic Corp., 2000 WL 91939, at *9-11. We think plaintiffs were held to a more stringent standard than the law requires and that the trend in declining sales and increasing returns is adequately alleged.
 
 
 31
 1. Decline in Sales.
 
 
 32
 The complaint specifically sets out the distributors through which Goosebumps books were sold, and alleges declines in sales as of specific dates, some in terms of percentage and others in terms of quantity. Such information covers over two-thirds of Scholastic's trade business in Goosebumps.
 
 
 33
 For example, according to the complaint, Advanced Marketing Services Incorporated (AMS) represents 15 percent of Goosebumps sales. It was selling 20,000 sets of Goosebumps per week in June 1995, but only 10,000 sets per week in the fall of 1996. It downloads point-of-sale data (POS data) into its computers on a daily basis and permits Scholastic to download that same information.
 
 
 34
 Ingram Distribution Group, Inc. which accounts for 50 percent of the Goosebumps trade, is said to have experienced a "significant decrease" in Goosebumps sales in the fall of 1996. Its orders dropped from 25,000 copies per title in September 1996 to 12,000 per title in January and February 1997. According to a senior manager at Ingram, this decline in a series was the steepest he had seen in his 15 years of experience in the book business. Ingram transmitted this information to Scholastic electronically and also collected POS data that was available to Scholastic.
 
 
 35
 Further, trade sales of Goosebumps books through Aramark Corporation, a book distributor that sells to mass retailers Target, Walmart and Kmart, allegedly dropped 50 percent between September 1995 and the fall of 1996. Target tracked Goosebumps sales on a weekly basis and sent its reports to the sales department at Scholastic.
 
 
 36
 The complaint similarly states that Caldor Corporation sold 6,000 to 7,000 books per week in September 1995, but only 3,000 books per week in September 1996. Its retail sales dropped further to 1,800 books per week in January 1997. Scholastic is said to have known of these trends both because Caldor's orders for Goosebumps books decreased, and because Caldor tracked daily sales figures and made them available to Scholastic.
 
 
 37
 Plaintiffs allege that Scholastic not only had access to POS data, but also reviewed it. Scholastic "thus knew how a substantial percentage of its Goosebumps books were selling in the trade market on at least a weekly basis, and also, therefore, the growing number of unsold Goosebumps books distributors and retailers had in inventory that were subject to full return."
 
 
 38
 2. Increase in Returns.
 
 
 39
 Again, according to plaintiffs, the information on Goosebumps books returned each day to Scholastic's warehouse in Jefferson City, Missouri -- the warehouse through which the company processes and fulfills most orders for trade distribution -- are entered into an "AS400" computer at the warehouse. That information, in turn, is transferred each night to Scholastic's corporate offices. By Christmas 1996, Greg Wong, a Scholastic employee responsible for evaluating inventory levels in Scholastic's New York office, allegedly told the inventory manager at the Jefferson City warehouse that the situation for Goosebumps had taken a turn for the worse and returns would continue to mount because many titles were overstocked and overbought.
 
 
 40
 Plaintiffs further allege defendant Marchuk monitored internal data. Along with Leslie Lista, Scholastic's comptroller, he compiled and distributed a "Director's Book" each month to all members of the board. The Director's Book analyzed trade sales data and provided commentary on sales trends. Moreover, trade sales figures were sent to the head of each Scholastic division on a weekly basis, and the sales department received weekly trade book sales reports, title by title, from the company's Jefferson City warehouse.
 
 
 41
 With respect to outside information, Toys R Us returned "an unusually high amount" of Goosebumps books in December 1996, after advising Scholastic earlier in the month that their increasingly scary content was resulting in a "significant" growth in returns. Returns from distributor Levy Home Entertainment "began to rise to unprecedented levels" in November and December 1996. Its returns in January 1997 equaled 50 to 70 percent of October and November 1996 sales. By January 1997 the amount of returned books consigned to the employee bookstore had grown to such an extent that little room existed to walk into the store.
 
 
 42
 The complaint asserts that ultimately, returns for January 1997 amounted to about $4 or $5 million, an increase of 150 percent over January 1996 levels. The complaint also alleges that this information was known to defendants in early February, prior to the time when defendants allegedly assured Merrill Lynch that returns remained at normal levels.
 
 
 43
 3. Pleadings Sufficiently Specific. The district court viewed certain allegations regarding December 1996 book returns as "too vague." Scholastic Corp., 2000 WL 91939, at *11. Yet, a reasonable inference can be drawn that if Goosebumps sales through AMS and Aramark declined throughout the fall of 1996, and sales through Ingram and Caldor dropped by about 50 percent from September 1996 through January 1997, then a decline was also experienced through the month of December 1996.
 
 
 44
 With respect to sales, the district court faulted plaintiffs for employing pre-class period information in their pleadings, and for not relying instead on sales data from the relevant period, that is, from December 1996 -- data that it said would have shown that declining sales were made known to defendants. Scholastic Corp., 2000 WL 91939, at *10. Pre-class data is relevant in this case, however, to establish that at the start of the class period, defendants had a basis for knowing increased Goosebumps sales were unlikely in the third quarter due to marked decreased sales experienced in the second quarter. Just as our cases have relied on post-class period data to confirm what a defendant should have known during the class period, see, e.g., Rothman, 220 F.3d at 92; Novak, 216 F.3d at 312-13, so the same logic applies here.
 
 
 45
 Any information that sheds light on whether class period statements were false or materially misleading is relevant. Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation. See Ross v. A.H. Robins Co., 607 F.2d 545, 557 n.20 (2d Cir. 1979). Moreover, the district court failed to take into account the alleged facts that Scholastic reviewed POS data made available by AMS and Caldor on a daily basis, by Target on a weekly basis and by Ingram to learn returns would be on the rise.
 
 
 46
 Plaintiffs also include allegations as to company-generated statistics. In San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, 75 F.3d 801, 812 (2d Cir. 1996), we held that an "unsupported general claim of the existence of confidential company sales reports that revealed [a] larger decline in sales is insufficient to survive a motion to dismiss." We then cited cases from other circuits stating that a plaintiff needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them. Id. at 812-13 (citing Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 365 (1st Cir. 1994) (specific identification of internal report held sufficient), superseded by statute on other grounds, see Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999), and Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993) (failure to give specific identification held insufficient)). Plaintiffs have satisfied this standard by specifying who prepared internal company reports, how frequently the reports were prepared and who reviewed them. We further observe that the complaint gives additional indications as to the nature of the reports, because the allegations are immediately preceded and followed by figures from retailers to show sales were declining. In San Leandro, we noted that plaintiffs had simply made an unsupported general claim that confidential company sales reports existed to contradict public statements. See 75 F.3d at 812. Plaintiffs here instead have gone beyond the bare pleadings found in San Leandro, and have met the criteria identified in Arazie and Serabian.
 
 
 47
 Moreover, always according to the amended complaint, Scholastic engaged in aggressive sales practices during the second and third quarters of its 1996-97 fiscal year. This, if proven, would furnish additional support for the proposition that company officials were aware of declining sales and increasing returns. These aggressive tactics, allegedly, included: offering excessive discounts beyond the company's normal practices for the purchase of additional books; altering its return policy to delay the return of Goosebumps books; encouraging distributors to keep unsold books rather than return them; and assuring distributors that Scholastic would extend its billing period for 90 days -- and sometimes for as long as six months. Scholastic gave distributors free advertising dollars, subsidized freight costs when books were finally returned, and repackaged Goosebumps books and merchandise at no cost. In this way, plaintiffs claim, defendant staved off or delayed disclosure of the huge amount of book returns to its inventory and delayed having to set up adequate reserves for the income it had reported, but due to huge returns would never receive.
 
 
 48
 The $13 million pre-tax special charge taken by Scholastic in February 1997 lends yet more support to the notion that defendants had knowledge of increasing returns. As stated earlier, post-class period data may be relevant to determining what a defendant knew or should have known during the class period. See Rothman, 220 F.3d at 92; Novak, 216 F.3d at 312-13. And an inference, from the size of the special charge, that trade business in Goosebumps books declined throughout the third quarter, is not unreasonable. Further, since January 1997 returns amounted to about $4 or $5 million, the claim that Scholastic took a charge almost three times that amount would support proofs that returns did not pile up only in that month, but throughout the class period.
 
 
 49
 Consequently, we conclude that plaintiffs pleaded with sufficient particularity facts necessary to show a downward trend with respect to Goosebumps' profitability. The facts alleged are sufficient to establish a trend even in the face of the admittedly cyclical nature of Scholastic's business. Scholastic explained in the September 1996 press release that its first quarter loss was not uncommon because of higher expenses not offset by greater revenues in the summer months. But, with the second and third quarters covering months when revenues should have increased, plaintiffs have alleged enough to permit proofs that Scholastic should have been alerted, by decreased sales and increased returns, to negative business results in the relevant time frame.
 
 
 50
 Further throwing doubt on its retail sales being subject to the cyclical nature of the school calendar, Scholastic's CEO said in a press release that Goosebumps books "continued to sell well in trade" even during the first quarter. If the books were selling well during typically slower summer months, and data began to show the books were not selling well during Scholastic's usually busier fall and winter months, plaintiffs could show defendants knew they had a problem that would affect the price of their stock and recklessly failed to acknowledge it at the time.
 
 
 51
 We conclude therefore that the facts alleged are sufficiently detailed to allow the plaintiffs to present proofs that the defendants knew, despite the fact that their business was cyclical, of a material downward secular trend. It may be that at summary judgment, or even at trial, the defendants demonstrate so profoundly cyclical a business and a strong enough link between normal cycles and the negative information available to them, that a reasonable jury could not find that they violated the securities laws. But any speculation to that effect is inappropriate at the pleadings stage.
 
 C. Scienter
 
 52
 The Securities Reform Act imposes on plaintiffs the obligation to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u- 4(b)(2); see also Novak, 216 F.3d at 311 (reaffirming that Second Circuit case law remains the standard after passage of the Act). Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness. See Novak, 216 F.3d at 307.
 
 1. Motive and Opportunity
 
 53
 Motive is the stimulus that causes a person or entity to act or to fail to act. Such stimulus ordinarily anticipates a concrete benefit defendant would realize by his conduct. Plaintiffs allege that defendant Marchuk was motivated to withhold damaging information about Goosebumps sales and returns so that he could sell his Scholastic stock at a higher price.
 
 
 54
 With respect to opportunity, Marchuk as an officer of Scholastic had access to insider information and thus had an opportunity to commit fraudulent acts. Our focus therefore rests on whether any motive existed for such conduct.
 
 
 55
 Plaintiffs' complaint alleges that Marchuk realized over $1.25 million in gross proceeds from the sale of his stock in defendant Scholastic during the class period. Marchuk sold a total of 19,400 shares -- approximately 80 percent of his holdings of Scholastic stock -- through trades on December 31, 1996 and January 2, 3, and 7, 1997. Plaintiffs claim that prior to these sales, he had not sold a single share of company stock since April 11, 1995.
 
 
 56
 The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit. See Novak, 216 F.3d at 307- 08. "Unusual" insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter. See Acito v. Imcera Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995). Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling. See Rothman, 220 F.3d at 94.
 
 
 57
 In San Leandro, 75 F.3d at 813-14, we said that a sale of stock by only one company executive netting over $2 million in profit did not give rise to a strong inference of fraudulent intent. In Rothman, 220 F.3d at 94, we held that an alleged $1.6 million profit on stock sales was not unusual. In Acito, 47 F.3d at 54, stock sales by one officer that amounted to less than 11 percent of his holdings also failed to qualify as "unusual."
 
 
 58
 But none of these cases established a per se rule that the sale by one officer of corporate stock for a relatively small sum can never amount to unusual trading. Rather, each case was decided on its own facts. For example, in both San Leandro and Acito, multiple individual defendants were named. We found in each case that the failure of other defendants to sell their stock undermined the plaintiffs' theories that negative information was withheld to obtain a higher sell price. See San Leandro, 75 F.3d at 814; Acito, 47 F.3d at 54. The second amended complaint in the present case, however, names only Marchuk as an individual defendant. Consequently, whether other Scholastic officials sold their stock prior to the February 20, 1997 press release is not only unknown, but, as to Marchuk's possible liability, is also irrelevant, since in that regard motive is considered with respect to Marchuk alone.
 
 
 59
 As to the amount of the sales, Rothman and San Leandro make clear that $1.25 million standing alone may not be unusual. Yet dollar amount cannot be considered in isolation. Rather the percentage of stock holdings sold may be indicative of unusual trading. To illustrate, in Rothman, 220 F.3d at 94, a second defendant sold shares for a $20 million return. Despite this large amount, we did not consider it evidence of unusual trading because the percentage of shares sold in relation to the number held was small. Id. at 95.
 
 
 60
 In contrast, Marchuk is alleged to have sold 80 percent of his holdings within a matter of days for a not insignificant profit, after having sold no Scholastic stock since 1995. Although defendants contest this information, whether plaintiffs can prove their allegations is not to be resolved on a Rule 12(b)(6) motion. Therefore, in the context of this appeal, plaintiffs have adequately alleged motive and opportunity on Marchuk's part for concealing facts that ultimately caused the price of Scholastic's stock to drop precipitously.
 
 
 61
 Marchuk counters that despite the sale of his stock, the alleged fraudulent and misleading statements attributable to Scholastic have not been properly made attributable to him. He notes the complaint pleads that he was involved in disseminating such statements only "upon information and belief." The Securities Reform Act provides that "if an allegation regarding [a] statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Notwithstanding the use of the phrase "all facts," plaintiffs need not plead with particularity every single fact upon which they base their beliefs concerning the false or misleading nature of defendant's statements, but instead are required only to plead with particularity sufficient facts to justify those beliefs. See Novak, 216 F.3d at 313-14. Contrary to Marchuk's contentions, plaintiffs have met this standard.
 
 
 62
 The complaint alleges that Marchuk was vice president for finance and investor relations, and therefore in a position both to access confidential information and to control the extent to which it was released to the public. Cf. San Leandro, 75 F.3d at 814 n.14 (observing that in addition to the sale of stock by only one defendant, "plaintiffs have alleged no facts suggesting that [this defendant] acting alone had the opportunity to manipulate [the company's] plans for his own advantage"). Assuming plaintiffs' allegations to be true, Marchuk was primarily responsible for Scholastic's communications with investors and industry analysts. He was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic during the class period. Marchuk had access to internal corporate documents and reports relating to trade sales and return data, conversed with other officers and employees and attended management and committee meetings. He helped prepare the Director's Books analyzing data and commenting on sales trends.
 
 
 63
 These alleged facts are detailed enough to justify plaintiffs' belief that Marchuk was one of the senior officials involved in conversations with market analysts such as Merrill Lynch. As such, Marchuk would also have been in a position to know Scholastic's sales/return data and evaluate whether statements disseminated to the public accurately reflected such information.
 
 2. Conscious Misbehavior and Recklessness
 
 64
 Plaintiffs' complaint adequately pleads scienter in its allegations concerning conscious misbehavior and recklessness on the part of Scholastic. To qualify as reckless conduct, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978). Where the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business. Novak, 216 F.3d at 308. Plaintiffs claim defendants knew or were reckless in not knowing from information provided by internal monitoring and access to trade sales data that sales of Goosebumps books were declining and returns were increasing.
 
 
 65
 We recognize Scholastic was required under the law to disclose only material information. Information is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). The complaint indicates the information as to increasing returns was important because Merrill Lynch boosted its rating of Scholastic stock in January 1997 based upon representations from the company that no surge in book returns had occurred. The sharp criticism from industry analysts after Scholastic's February 20 press release further indicates the weight given to information pertaining to Goosebumps sales and returns.
 
 
 66
 As to whether plaintiffs adequately pled an inference of reckless intent, we find they did. Our discussion in Sections IA and B illustrates that the second amended complaint contains detailed allegations as to what defendants knew on a daily, weekly and monthly basis about the retail trade of Goosebumps books, while at the same time making public statements that painted a different picture. Defendants publicly represented that returns were not increasing and failed to adjust revenues despite their knowledge of rapidly rising returns; these actions, if proven, are consistent with recklessness. See Rothman, 220 F.3d at 90-91.
 
 
 67
 In this respect, the most egregious allegations involve Scholastic's response to inquiries from Merrill Lynch in early February 1997. At this point, even disregarding the information ostensibly received from computer runs, Scholastic knew the return rate for January 1997 had increased 150 percent from the year before. Yet by telling Merrill Lynch that return rates remained at normal levels of 20 percent, defendants acted in ways that could be found to be reckless.
 
 
 68
 Recklessness may also be shown based on the allegations that defendants learned from Toys R Us in early December 1996 that the newer Goosebumps books were too "scary" and hence were being returned. Defendants allegedly had represented to industry analysts at the time that more recent Goosebumps titles were doing well in the trade. Moreover, the combined total of $24 million in special charges during the third and fourth quarters undermines, at the pleading stage, the argument that defendants were unaware of the sharp increase in Goosebumps returns until shortly before Scholastic's February 20, 1997 press release. See Rothman, 220 F.3d at 92 (finding that the magnitude of defendant's post- class period write-off, together with the allegations of poor sales, constituted sufficient pleadings as to recklessness).
 
 
 69
 Finally, defendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness. Although Scholastic had adopted Statement of Accounting Standard 121, several months passed from September to February before a special pre-tax charge was taken to account for returns. Despite public statements that considerable management attention was given to monitoring returns, Scholastic issued no warnings or corrections after seeing first quarter sales suffer in comparison to the previous year and after revealing to Merrill Lynch in December that second quarter sales had suffered in similar fashion. See Rothman, 220 F.3d at 91 (describing a "reckless failure to follow an announced policy"); Novak, 216 F.3d at 311 (describing defendants who "knowingly sanctioned procedures that violated the Company's own markdown policy").
 
 
 70
 II. Section 20(a) "Controlling-Person" Liability Claim
 
 
 71
 The district court also dismissed plaintiffs' § 20(a) claim because it concluded that the primary violation asserted was not adequately pled. Section 20 provides:
 
 
 72
 Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 
 
 73
 15 U.S.C. § 78t(a).
 
 
 74
 "Controlling-person liability" is a separate inquiry from that of primary liability and provides an alternative basis of culpability. See SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 812 (2d Cir. 1975). A plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant, and culpable participation by the defendant in the perpetration of the fraud. See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).
 
 
 75
 The district court dismissed plaintiffs' § 20(a) claim for failure to plead a primary § 10(b) violation. Scholastic Corp., 2000 WL 91939, at *14. Since on appeal defendants offer no basis for dismissing the secondary liability claim if we reverse the dismissal of the securities fraud causes of action, we hereby reinstate it.
 
 CONCLUSION
 
 76
 Accordingly, for the reasons stated the judgment appealed from is reversed, plaintiffs' complaint is reinstated, and the case is remanded to the district court for further proceedings not inconsistent with this opinion.
 
 
 
 NOTES:
 
 
 *
 Hon. Charles S. Haight, Jr., United States District Court Judge for the Southern District of New York, sitting by designation.
 
 
 [1]
 We recognize that Congress amended §§ 10 and 20 through legislation passed at the end of 2000. See Consolidated Appropriations - FY 2001, Pub. L. No. 106-554, Appendix G - H.R. 5660, §§ 205(a)(3), 206(g), 303(d), (i) & (j), 114 Stat. 2763, 2763G-1, 2763G-62, 2763G-68, 2763G-90, 2763G-92 (2000). These changes have no bearing on the merits of this appeal.