**In re MSC INDUSTRIAL DIRECT CO., INC. Securities Litigation.**

**No. 02CV4422(ADS)(WDW).**

United States District Court,
E.D. New York.

Sept. 13, 2003.

Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, by Joshua H. Vinik, Esq. and Elizabeth A. Berney, Esq., Of Counsel, Attorneys for the Lead Plaintiff the International Association of Machinists National Pension Fund.

Curtis, Mallet–Prevost, Colt & Mosle, LLP, New York, NY, by Eliot Lauer, Esq., Nancy E. Delaney, Esq. and Theresa A. Foudy, Esq., Of Counsel, Attorneys for the Defendants.

## ORDER

SPATT, District Judge.

This case involves allegations that MSC Industrial Direct Company, Inc. ("MSC") and certain of its officers and directors (collectively, the "defendants") made materially false and misleading statements concerning the financial health of MSC in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Presently before the Court is a motion by the defendants to dismiss the amended consolidated class action complaint (the "amended complaint") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I.  BACKGROUND

### A.  The Procedural History

The present case is a consolidated class action arising out of two separate actions:

*Nunziata v. MSC Industrial Direct Co.*, 02CV4422 (E.D.N.Y. filed on Aug. 8, 2002) and *Sandra Joan Malin Revocable Trust v. MSC Industrial Direct Co.*, 02CV4503 (E.D.N.Y. filed on Aug. 14, 2002). On September 11, 2002, the Court consolidated the two actions under *In re MSC Industrial Co. Inc. Secs. Litig.*, 02CV4422. On November 6, 2002, the Court designated International Association of Machinists National Pension Fund ("IAM") as lead plaintiff and appointed Milberg Weiss Bershad Hynes & Lerach LLP lead counsel. On December 23, 2002, the plaintiff filed the amended complaint.

## B. The Amended Complaint

### 1. The Parties

The following facts are taken from the amended complaint unless otherwise indicated. The plaintiffs purchased shares of MSC common stock during the period of January 11, 1999 to August 5, 2002 (the "Class Period"). MSC is a New York corporation with its principal place of business in Melville, New York. It is one of the largest direct marketers of a broad range of industrial products to small and mid-sized customers in the United States.

The following are the officers and directors who are named as individual defendants in the amended complaint: Mitchell Jacobson; Sidney Jacobson; Charles A. Boehlke, Jr.; Shelley M. Boxer; David Sandler; and James Schroeder. At all relevant times, Mitchell Jacobson was MSC's Chairman, President and Chief Executive Officer ("CEO"). At all relevant times, Sidney Jacobson was MSC's Vice Chairman of the Board of Directors. Since June 2000, Boehlke has served as MSC's Chief Financial Officer ("CFO") and Senior Vice President and since January 2001 he has served as an MSC Director. At all relevant times, Boxer was MSC's Vice President of Finance and an

MSC Director. From September 1998 to June 1999, Sandler served as MSC's Senior Vice President of Administration and was appointed Executive Vice President and an MSC Director in June 1999. At all relevant times, Schroeder was MSC's Senior Vice President of Logistics and an MSC Director.

### 2. The Factual Allegations

On August 5, 2002, MSC announced in a press release that:

> [F]ollowing an internal financial review, [it] has discovered incorrect accounting entries associated with inventory purchases that overstated net income by approximately $8.3 million over the past four years. The incorrect entries resulted in the understatement of cost of goods sold and accounts payable and occurred primarily in fiscal 1999 and fiscal 2000. As a result, [MSC] intends to restate its financial statements for fiscal years 1999, 2000, 2001 and year-to-date 2002. MSC expects that this restatement will have no material impact on [its] current financial position, its operations or prospects for growth.... Based upon preliminary estimates, [MSC] expects that the restatement will reduce previously reported net income by approximately $2.8 million in fiscal 1999, $4.2 million in fiscal 2000, $0.9 million in fiscal 2001, and $0.4 million in fiscal 2002. Earnings per share would be reduced by approximately $0.04 in fiscal 1999, $0.06 in fiscal 2000, $0.01 in fiscal 2001, and less than $0.01 in fiscal 2002.

After this announcement, shares of MSC fell $4.99 per share to close at $10.51 per share, a one-day decline of 32%, on volume of more than 3.95 million shares or more than 26 times the average daily volume. Three days after the issuance of the press release, on August 8, 2002, the first com-

plaint was filed against MSC. Without any supportive facts, that complaint alleged that the incorrect accounting entries noted in the press release were the result of fraud.

On November 26, 2002, MSC filed its Form 10–K for fiscal year 2002 which included the restated financial statements for fiscal years 1999 through 2002. In that 10–K, MSC noted that, "[t]he accompanying financial statements have been restated to adjust for the effects of incorrect accounting for inventory purchases, reserves, and to adjust for accruals between periods primarily related to estimates for bonuses." The restated financial statements showed a reduction in MSC's net income by $2.9 million or 6% in 1999; by $6.7 million or 12.7% in 2000; by $0.6 million or 1.5% in 2001; and by $0.5 million or 1.8% for the first three quarters of 2002. On November 27, 2002, MSC's stock closed at $17.60 per share.

On December 23, 2002, the plaintiffs filed the amended complaint. In support of its fraud claim, the amended complaint alleges that the defendants engaged in reserve manipulation otherwise known as "cookie jar accounting". Reserve manipulation is a practice whereby a company sets generous reserves to cover estimated costs such as taxes, litigation or acquisitions that might be incurred in good years and then takes the excess amounts in those reserves during bad years to boost earnings. This allows a company to understate its earnings in good years and overstate them in bad years. In support of the reserve manipulation theory, the amended complaint alleges the following:

(1) A former director of an MSC corporate department (the "Former Corporate Department Director") reported that, "he heard that Defendants took a big writeoff on the Enco acquisition [a new company acquired by MSC] by taking a reserve against it, never used the reserve ('they kinda took a writedown but didn't take a writeup') and ended up making a lot of money after liquidating the reserve."

(2) An anonymous informant reported that in 1997, MSC booked a $50 million inventory reserve when it acquired Enco and then sold off the inventory at fire-sale prices and took all the proceeds into earnings.

(3) A former MSC employee whose responsibilities were associated with MSC's acquisitions (the "Former Acquisition Employee") stated that, " 'I heard that they played all kinds of games with the inventory from the [Enco] acquisition. They bought $50 million worth of inventory and wrote it all off and then sold it and took it all into earnings.' "

(4) A former employee with high-level corporate duties (the "Former Corporate Employee") stated, " 'all you have to do is look at the inventory reserves as a percentage of inventory quarter to quarter. That tells the whole story.' "

(5) The Former Corporate Department Director reported that between 1997 and 1999, after regular meetings of senior MSC executives, various executives stated, " '[w]e didn't do that well, but don't worry, we have enough overage in our reserves to keep making our Wall Street numbers.' "

(6) The Former Corporate Department Director reported that in or about the fall 1999, senior executives stated, " '[w]e're in trouble; we ran out of reserves to make our numbers.' "

(7) The Former Corporate Department Director reported that, the "Defendants were scared of even missing one quarter's numbers, because MSC portrayed itself as the first company to ever make 8 or 12 straight quarters after going public." He or she also heard that, " 'in

the really good years they actually reduced their Wall Street earnings reports and put a bunch into a reserve fund for a rainy day and then when things started going badly, and instead of taking a hit in the quarter that it went badly, they just released reserves against it.'"

(8) The Former Corporate Department Director summarized the sources of reserves which were used to manage earnings as follows: "these reserves came from the big write off of inventory taken after the Enco acquisition followed by the sales of the Enco inventory that had been written off; from money 'socked away' during really good quarters (during which time the Company actually reduced its earnings reports so as to be able to put the money into a reserve fund 'for a rainy day'); from small percentage bump-ups in inventory reserves (which could have a big impact on earnings); and from some excess funds, above what the Company had expected, from the Company's initial public offering."

(9) The Former Corporate Employee stated that, "although the Enco inventory was written off after the acquisition, the inventory was in actuality sold in 'fire sales' in Chicago and Detroit throughout the next several years. The 'fire sale' proceeds were used to buttress earnings, rather than charged back against the reserve." In addition, she or he overheard "Boxer boast about taking big reserves from acquisitions and using the reserves to manage earnings … [and that] MSC utilized the same pattern of taking reserves and writing off inventory whenever it acquired other companies, and then using reserves and the written-off inventory to improperly buttress earnings."

Under the heading "Additional Scienter Allegations", the amended complaint sets forth the following in support of the allegation that the defendants knew MSC's financial statements during the Class Period were false:

(1) With the knowledge of Mitchell Jacobsen and Sandler, Boxer tracked the reported versus the actual results during the Class Period.

(2) MSC had a detailed tracking and information systems and analyses which were performed for and provided to the defendants, including daily sales tracking and analysis of what sales were and what had been shipped; daily sales reports were e-mailed or hand-delivered to the defendants every day; monthly trend analysis, sales reports and forecast were provided to the defendants; specific inventory reports and analyses were provided to the defendants; and additional inventory analyses were provided to MSC senior management.

(3) Defendants had counts and recounts made of inventories at the large distribution centers.

(4) With all the executive offices in one section of the building, the defendants shared information.

(5) A former managerial employee reported that Jacobson and Boxer pulled, "the strings behind MSC's fraudulent financial reporting, due to Jacobson's concern that the Jacobson family fortune was tied up with MSC's ability to make its Wall Street numbers."

(6) The defendants made frequent visits to the MSC branch offices where they could observe MSC's obsolete inventory.

(7) There was pervasive family relationship and involvement in a number of aspects of MSC's business. For example, companies owned by Mitchell Jacobson and his sister Marjorie Gerschwind leased to MSC its Atlanta distribution center and eight of MSC's branch offices during the Class Period.

(8) Several former MSC employees reported that MSC initiated hiring freezes before and during the Class Period as a result of financial difficulties but the defendants publically reported 30% per year growth and misleading financial statements.

(9) A former high-level MSC employee reported that, "the industrial distribution industry is highly competitive and leaves virtually no room for gross margins to increase by the percentages claimed by Defendants."

In further support of the allegation that the defendants knew MSC's financial statements during the Class Period were false, the amended complaint sets forth the stock sales of the individual defendants and other insiders. Mitchell Jacobson allegedly sold over nine million shares of MSC stock during the Class Period. Boxer allegedly sold 80,000 shares in 2000, 7,200 shares in 1999 and 8,000 in 2001. Schroeder allegedly sold 222,464 shares in 2000. Sandler allegedly sold 200,000 shares in 2000 and 185,537 in 2002. Gerschwind allegedly sold 3,600,621 shares in 1999, 1,161,091 shares in 2000, 1,399,680 shares in 2001 and 1,110,018 shares in 2002. The amended complaint does not provide the percentage of shares sold to shares held by the individual defendants or the other insiders.

The amended complaint asserts two claims. The first claim alleges that during the Class Period the defendants artificially inflated the market price of MSC stock by making materially false and misleading statements about its financial health in violation of Section 10(b) of the Exchange Act and Rule 10b–5. The second claim alleges that the individual defendants are liable as "control persons" for making the false and misleading statements about MSC's financial health in violation of Section 20(a) of the Exchange Act.

In their motion, the defendants argue that the amended complaint should be dismissed because it does not allege facts describing the alleged fraud with the required level of particularity. In addition, they argue that the amended complaint fails to sufficiently plead scienter. In opposition, the plaintiffs contend that the amended complaint sufficiently alleges that the defendants manipulated MSC's reserves in order to meet predetermined earnings targets. The plaintiffs also assert that the amended complaint adequately pleads scienter.

## II. DISCUSSION

### A. The Standard of Review

In a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court should dismiss the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle him to relief. *See King v. Simpson,* 189 F.3d 284, 286 (2d Cir.1999); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (holding that dismissal is inappropriate unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"). The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *See Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). Indeed, it is not the Court's function to weigh the evidence that might be presented at trial; instead, the Court must merely determine whether the complaint itself is legally sufficient. *See Villager Pond,* 56 F.3d at 378. The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plain-

tiff. *See Koppel v. 4987 Corp.,* 167 F.3d 125, 127 (2d Cir.1999); *Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998).

In making this decision, the Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999); *see Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir.2000) (holding that for the purpose of deciding a motion to dismiss, the complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999). The Court also may consider documents that the plaintiff either possessed or knew about and upon which he relied in bringing the suit. *Rothman,* 220 F.3d at 97; *Cortec Industries, Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991). Further, in securities fraud actions, the Court may consider "public disclosure documents required by law to be and which actually have been filed with the SEC." *Rothman,* 220 F.3d at 89 (citing *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991)); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808–09 (2d Cir. 1996).

Rule 9(b) of the Federal Rules of Civil Procedure sets forth additional pleading requirements with respect to the allegations of fraud. In particular, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). But, under Rule 9(b), "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." *Id.* Securities fraud actions are subject to the requirements of Rule 9(b). *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir. 1994). However, the Private Securities Litigation Reform Act of 1995 (the "Reform Act") heightened Rule 9(b)'s requirement for pleading scienter. *See* 15 U.S.C. § 78u–4(b)(3)(A); *see also Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 537–38 (2d Cir.1999). As a result, in securities fraud actions, scienter may not be averred generally. Rather, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Press,* 166 F.3d at 538 (quoting 15 U.S.C. § 78u–4(b)(3)(A)); *see also Chill v. General Elec. Co.,* 101 F.3d 263, 268–69 (2d Cir.1996).

## B. The 1934 Exchange Act Claims

### 1. Section 10(b) and Rule 10b–5

Section 10(b) of the Exchange Act prohibits the use of "manipulative or deceptive" practices in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10b–5 presents specific practices that are considered "manipulative or deceptive." 17 C.F.R. § 240.10b–5(b). Rule 10b–5 provides that, "[i]t shall be unlawful ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege that, in connection with the purchase or sale of securities: (1) the defendant made a false material representation or omitted to disclose material information; (2) the defendant acted with scienter; and (3) the plaintiff detrimentally relied upon the defendant's fraudulent acts. *See Press,* 166 F.3d at 534. As noted above, a plaintiff

must allege elements one and two—fraudulent acts and scienter—with particularity in order to meet the heightened pleading requirements set forth in Rule 9(b) and the Reform Act. *See supra* Part II.A.

### a. The Fraudulent Acts

The defendants argue that the amended complaint fails to adequately allege that they engaged in reserve manipulation during the Class Period. The plaintiffs respond that the amended complaint sufficiently alleges that the defendants manipulated MSC's reserves in order to meet predetermined earnings targets.

■ To satisfy the particularity requirements of Rule 9(b) and the Reform Act, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). Here, the alleged misleading statements and omissions were made in specifically identified disclosures or press releases discussing MSC's financial disclosures. Therefore, the first three prerequisites are satisfied. However, for the reasons stated below, the Court finds that the fourth requirement is not met.

■ First, the allegations concerning reverse manipulation are vague. The amended complaint does not explain how the defendants' use of reserve manipulation caused earnings figures that were materially inflated for fiscal years 1999, 2000, 2001 and the first three quarters of 2002. *See Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 193–94 (2d Cir. 1998) ("A plaintiff's conclusory allegation that markups are excessive is similar to a barroom generality; it is insufficient to

state a securities fraud claim."). Moreover, the amended complaint does not allege what the inventory reserve for Enco or any other acquired company should have been. *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir.1982) (finding allegations that company failed to write down value of obsolete manufacturing facilities does not sufficiently plead fraud where the complaint did not allege amounts at which facilities were carried or should have been carried on the company's books). Furthermore, the amended complaint does not specify the amounts at which the alleged improper write-downs of acquisition inventory or the other alleged reserve manipulation caused MSC to overstate its earnings. Finally, the amended complaint does not provide MSC's predetermined earnings targets for fiscal year 1999, 2000, 2001 and 2002 and whether it met those targets.

Second, the allegations of reserve manipulation are based on vague quotes and conclusory rumors. Relying on confidential sources, the amended complaint alleges the following anonymous statements: " 'I heard that they played all kinds of games with the inventory from the [Enco] acquisition. They bought $50 million worth of inventory and wrote it all off and then sold it and took it all into earnings' "; " 'all you have to do is look at the inventory reserves as a percentage of inventory quarter to quarter. That tells the whole story' "; " '[w]e didn't do that well, but don't worry, we have enough overage in our reserves to keep making our Wall Street numbers' "; " '[w]e're in trouble; we ran out of reserves to make our numbers' "; "Defendants were scared of even missing one quarter's numbers, because MSC portrayed itself as the first company to ever make 8 or 12 straight quarters after going public"; " 'in the really good years they actually reduced their Wall

Street earnings reports and put a bunch into a reserve fund for a rainy day and then when things started going badly, and instead of taking a hit in the quarter that it went badly, they just released reserves against it' "; "these reserves came from the big write off of inventory taken after the Enco acquisition followed by the sales of the Enco inventory that had been written off; from money 'socked away' during really good quarters (during which time the Company actually reduced its earnings reports so as to be able to put the money into a reserve fund 'for a rainy day'); from small percentage bump-ups in inventory reserves (which could have a big impact on earnings); and from some excess funds, above what the Company had expected, from the Company's initial public offering."

■ Third, the sources of the plaintiffs' allegations are insufficiently described. At the pleading stage, confidential sources need not be named, "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000). The plaintiffs describe their confidential sources as, "a former director of an MSC corporate department"; "a former MSC employee whose responsibilities were associated with the Company's acquisitions"; a "former employee with high-level corporate duties" and "an anonymous informant". The description of these sources are not sufficiently particular to support the probability that they would possess information concerning the alleged reverse manipulation theory. The amended complaint does not state how long these sources worked for MSC. Nor does it state that they had any connection with MSC's accounting department or that their work

responsibilities would provide them a basis for knowing the details of the accounting at MSC.

Based on the foregoing, the Court finds that the amended complaint does not sufficiently allege that MSC engaged in reserve manipulation during the Class Period to meet predetermined earnings targets.

**b. Scienter**

■ The defendants argue that the amended complaint does not sufficiently plead scienter. "Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud or at least knowing misconduct." *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996) (citations omitted). The Second Circuit requires a plaintiff to "allege facts that give rise to a strong inference of fraudulent intent." *Acito*, 47 F.3d at 52 (citing *Shields*, 25 F.3d at 1128). To establish a strong inference of fraudulent intent, the complaint must allege facts that either: (a) "show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (quoting Shields, 25 F.3d at 1128).

**i. Motive and Opportunity**

■ "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Novak*, 216 F.3d at 307 (quoting *Shields*, 25 F.3d at 1130). Allegations that simply identify the same motives "possessed by virtually all corporate insiders" are insufficient to establish a strong inference of fraudulent intent. *Id.* For example, "[i]nsufficient motives ... include

(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001) (citing *Novak*, 216 F.3d at 307–08). However, motive is "sufficiently pleaded where plaintiff allege[s] that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." *Id.* To show motive based on stock sales, the plaintiff must allege that those sales were "unusual". *In re Scholastic Corp. Secs. Litig.*, 252 F.3d 63, 74 (2d Cir.2001) (citing *Acito*, 47 F.3d at 54). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *Id.* (citing *Rothman*, 220 F.3d at 94).

■■■ The plaintiffs argue that the defendants were personally motivated to participate in or recklessly disregarded MSC's accounting violations and earnings management by their sale of artificially inflated stock during the Class Period. Among other things, the defendants contend that the amended complaint massively overstates the defendants' and insiders' stock sales.

The Court finds that the amended complaint does not sufficiently allege that the defendants' and insiders' sale of stock during the Class Period was unusual. First, the plaintiffs concede that the amended complaint contains incorrect information which overstates the actual number of shares sold by Michell Jacobsen, Marjorie Gershwind, Boxer, Schroeder and Sandler. Second, the amended complaint does not provide the percentage of shares sold to shares held by the individual defendants and the other insiders. *See In re Scholastic*, 252 F.3d at 74 (noting that the portion of stockholdings sold is a significant factor

concerning motive). Third, Mitchell Jacobson, the individual with the greatest ownership interest in MSC, increased his ownership in the company during the Class Period. Accordingly, the plaintiffs have not met their burden to show that the defendants' sale of stock during the Class Period was unusual.

### ii. Conscious Misbehavior or Recklessness

■■■ Conscious misbehavior or recklessness may be shown where the defendant's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman*, 220 F.3d at 90 (internal quotation marks and citation omitted). At the pleading stage, a plaintiff has met her burden when she has "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Kalnit*, 264 F.3d at 142 (citation omitted). A plaintiff may sufficiently allege recklessness where the allegations show that the defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308. A restatement of financial disclosures, by itself, is not sufficient. *Id.* at 309; *see also Stevelman*, 174 F.3d at 84.

■■■ The plaintiffs argue that the defendants knew that their public statements were inaccurate because they involved themselves in or were aware of MSC's accounting manipulations. The defendants respond that their general knowledge of MSC's sales and inventory does not show

conscious misbehavior or recklessness. For the reasons set forth below, the Court agrees with the defendants.

In the first instance, the reserve manipulation theory is not alleged with sufficient particularity. *See supra* Part II.B.1.a. Second, the plaintiffs do not allege specific facts that support the contention that the defendants should have learned of the accounting errors earlier. Rather, the plaintiffs allege that the defendants had general knowledge of MSC's sales and inventory. *See Novak,* 216 F.3d at 311–12 (requiring that the plaintiff plead the defendants' knowledge of specific facts concerning inventory that contradicted their public statements regarding inventory).

The plaintiffs also argue that MSC's restatement over a four-year period and the defendants' access to actual inventory information establishes scienter. The Court disagrees. A restatement, by itself, is insufficient to plead a securities fraud claim. *See Stevelman,* 174 F.3d at 84. Also, MSC's restatement was not egregious. Rather, MSC's combined restatement for the four year period was a reduction of net income of 6%. *See In re Health Mgmt., Inc., Sec. Litig.,* 970 F.Supp. 192, 199 (E.D.N.Y.1997) (noting overstatement of net income by 116%). As such, the amended complaint does not sufficiently allege conscious misbehavior or recklessness. Accordingly, the Court finds that the amended complaint does not raise a strong inference of scienter.

Based on the foregoing, the motion to dismiss the Section 10(b) and Rule 10b 5 claim pursuant to Rule 9(b) and the Reform Act is granted.

#### 2. Section 20(a)

■ Section 20(a) of the Exchange Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To state a claim for control person liability under Section 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) the controlling person's culpability in the primary violation. *See Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). Because the plaintiffs have not sufficiently alleged a primary violation, namely a Section 10(b) or Rule 10b–5 violation, their Section 20(a) claim also must fail. *See In re NBTY, Inc. Secs. Litig.,* 224 F.Supp.2d 482, 496 (E.D.N.Y.2002).

#### C. Leave to Amend

The plaintiffs have requested leave to file a second amended consolidated class action complaint to cure any deficient claims. Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a complaint "shall be freely granted when justice so requires." *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."). The Court grants the plaintiffs leave to file a second amended consolidated class action complaint within 30 days from the date of this order.

### III. CONCLUSION

Based upon the foregoing, it is hereby

ORDERED, that the motion to dismiss the Section 10(b) and Rule 10b–5 claim pursuant to Rule 9(b) and the Reform Act is **GRANTED;** and it is further

ORDERED, that the motion to dismiss the Section 20(a) claim is **GRANTED;** and it is further

ORDERED, that the plaintiffs are granted leave to file a second amended consolidated class action complaint within 30 days of the date of this decision; and it is further

ORDERED, that the Clerk of the Court is directed to close this case within 30 days of the date of this decision if the plaintiffs do not file a second amended consolidated class action complaint.

**SO ORDERED.**