**In re NBTY, INC. SECURITIES LITIGATION.**

**No. 00CV4402(ADS)(ARL).**

United States District Court,
E.D. New York.

Sept. 28, 2002.

Milberg Weiss Bershad Hynes & Lerach LLP by Joshua H. Vinik, Esq. and George H. Sallaway, Esq., New York City, Wechsler Harwood LLP by Robert I. Harwood, Esq., Frederick W. Gerkens, III, Esq. and Jeffrey M. Norton, Esq., New York City, for Plaintiffs.

Edwards & Angell, LLP by Robert Novack, Esq. and Charles W. Stotter, Esq., Short Hills, NJ, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiffs bring this consolidated class action against the defendants NBTY, Inc. ("NBTY") and certain of its officers

and directors (collectively, the "defendants") alleging that the defendants made materially false and misleading statements concerning the financial health of NBTY in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Presently before the Court is a motion by the defendants to dismiss the consolidated class action complaint (the "complaint") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A. The Procedural History

The present case is a consolidated class action arising out of six separate actions: *Hilliard v. NBTY*, 00CV4402 (E.D.N.Y. filed July 28, 2000); *Hojaiban v. NBTY*, 00CV4520 (E.D.N.Y. filed Aug. 4, 2000); *Schwartz v. NBTY*, 00CV4634 (E.D.N.Y. filed Aug. 9, 2000); *Schreiber v. NBTY*, 00CV4832 (E.D.N.Y. filed Aug. 16, 2000); *Marcus v. NBTY*, 00CV4878 (E.D.N.Y. filed Aug. 17, 2000); and *Wang v. NBTY*, 00CV5039 (E.D.N.Y. filed Aug. 22, 2000). On October 7, 2000, the Court consolidated the above-noted actions under docket number 00CV4402; appointed James H. Ellis, Steven Jay Levine and Ronald Braun lead plaintiffs (collectively, the "plaintiffs"); and appointed Milberg Weiss Bershad Hynes & Lerach LLP and Wechsler Harwood Halebrian & Feffer LLP lead counsel. On July 11, 2001, the plaintiffs filed the complaint.

### B. The Consolidated Class Action Complaint

#### 1. The Parties

The following facts are taken from the complaint unless otherwise noted. The plaintiffs were investors who purchased shares of NBTY common stock during the period of January 27, 2000 through June 15, 2000 (the "Class Period"). NBTY is a Delaware corporation with its principal place of business in Bohemia, New York. It manufactures and retails a broad line of nutritional supplements in the United States and the United Kingdom. Also, it markets a variety of products under a number of brand names, including Nature's Bounty, Vitamin World, Puritan's Pride, Holland & Barrett, Nutrition Headquarters and American Health.

The following are the officers and directors who are named as individual defendants in the complaint: Arthur Rudolph; Scott A. Rudolph; and Harvey Kamil. Arthur Rudolph was the founder of NBTY. From 1971 until his resignation in September 1993, he served as the Chairman of the Board of Directors and the Chief Executive Officer (the "CEO") of NBTY. From 1997 until December 2000, NBTY paid Arthur Rudolph $400,000 per year under a consulting agreement. Scott A. Rudolph joined NBTY in 1986 and was the Chairman of the Compensation Committee of the Board of Directors during the Class Period. Presently, Scott A. Rudolph is the Chairman of the Board of Directors, President and CEO of NBTY. Harvey Kamil, was at all relevant times the Executive Vice–President, Secretary and Chief Financial Officer of NBTY.

#### 2. The Factual Allegations

During the Class Period, the plaintiffs allege that the defendants made materially false and misleading statements in NBTY's reports filed with the SEC and its press releases. The following are the alleged misleading statements: On January 27, 2000, NBTY issued a press release announcing its financial results for the first quarter of 2000, which ended on December 31, 1999. It reported that net income rose 143% to $8,400,000 in comparison with the

$3,500,000 for the first quarter of 1999. In the press release, Scott Rudolph stated:

A key component of our strategy, our U.S. retail expansion, showed significant improvement during the quarter, with a 65% increase in total sales of our Vitamin World stores and same-store sales for the 189 stores open more than a year up 20%. We anticipate the Vitamin World retail business reaching breakeven during this fiscal year.

Sales of the Holland & Barrett retail stores in the United Kingdom increased 19%, sales of the Nature's Bounty wholesale business were up 21%, and the puritan.com catalog and Internet sales business showed a sales decline of 3% as it completed its shedding of unprofitable acquired product lines. We believe we are poised for growth at both the Holland & Barrett business, where we will open a large new warehouse and an Internet site this year, and at our puritan.com e-commerce business, where Internet sales are increasing rapidly and where our catalogs remain the market leader in the U.S.

Our major investments in vertical integration over the last several years allow us to grow efficiently by using our direct-to-customer sales data to quickly add the new products our customers request while also expanding our reach geographically. The 21% rise in the sales of our wholesale business validates our strategy of offering our wholesale customers new products for which we have found increasing demand based on the data we derive from the preferences of our retail customers in the U.S. and the U.K. We believe that information flow is a significant competitive advantage over manufacturers that have to rely on indirect feedback.

The plaintiffs allege that at·the end of the press release, the defendants advised investors that NBTY's business was subject to certain "risks and uncertainties". However, NBTY allegedly listed only factors that might affect its business in the retail nutritional supplement business, namely "retention of its customer base", "demand for and acceptance of new products" and "increased competition". After the January 27, 2000 press release, NBTY's stock rose $1.625 with trading volume of 1,573,-800 shares to close at $14.5625 from its previous day's close of $12.9375. On February 14, 2000, NBTY filed its quarterly Form 10–Q report for the first quarter of fiscal year 2000. In the quarterly Form 10–Q report, NBTY repeated substantially the same information in the January 27, 2000 press release and described its recent acquisitions of Dynamic Essentials and Nutrition Warehouse. Also, NBTY stated that it planned to integrate these two recent acquisitions into its existing operations. Further, NBTY reported a 21.4% increase in sales with a 19.9% increase in same-store sales in comparison with the first quarter of 1999.

On March 24, 2000, NBTY issued a press release announcing that it had signed a definitive agreement to acquire, for an undisclosed sum, the SDV vitamin catalog and mail order division of Rexall Sundown, Inc. In the press release, Scott Rudolph stated:

This acquisition will add more than 400,-000 active customers to the existing six million customer base of our puritan.com direct response division. . . . This acquisition reaffirms our leadership position in this market sector. Because of our automated infrastructure, these new customers can be served with no increase in overhead costs. The acquisition should have a positive impact on profitability. We continue to pursue the acquisition of our direct response businesses in the vitamin industry.

The plaintiffs allege that these statements were false and misleading causing Wall Street Analysts and investors to rely on them. In particular, to demonstrate this reliance, on March 31, 2000, Matthew Patsky, an analyst from Adams Harkness, upgraded his recommendation on the common stock of NBTY to "Strong Buy" from "Accumulate".

On April 10, 2000, NBTY issued a press release announcing that it had sales in the amount of $200,000,000 for the second quarter of 2000, which ended on March 31, 2000. In the press release, Scott Rudolph stated that "[t]he Company's strategy of delivering the highest quality nutritional supplements with the best value, increased market share and consumer acceptance of our products all contributed to this quarter's best-ever results." On that date, Chain Drug Review interviewed James Flaherty, the vice-president of marketing and advertising at NBTY. In the interview, Flaherty described a refinement to NBTY's weight-loss product line that would give it "an edge" over its competition and noted that changes in the market segment would make the approach of warmer weather a more competitive time for NBTY's industry than usual. Also, that day, John T. Mahoney, an analyst from Raymond James & Company, issued a "Buy" recommendation for NBTY's stock. On April 13, 2000, NBTY's stock price rose $1.8749 with heavy trading volume to close at $15.9375 from its April 7, 2000 close of $14.0625.

On April 27, 2000, NBTY issued a press release announcing its financial results for the second quarter of 2000. In the press release, NBTY reported that its net income rose 164% to $18,100,000 in comparison with the $6,800,000 for the second quarter of 1999. Also, NBTY noted that comparable Vitamin World same-store sales for stores open more than one year rose 15.6%. Further, Scott Rudolph stated that:

The large increase in net income reflected a jump in gross profit, which was 58% of sales in the quarter, up from 53% in 1999. Net income as a percent of sales was 9%, up from 4% in the three months ended March 31, 1999, because of the higher margin and a reduction in overhead as a percent of sales.

Our Vitamin World retail stores continued their improvement, and we still anticipate that the Vitamin World business will reach the breakeven point before the end of this fiscal year, although it will not show a profit for the full fiscal year. The increases in both the Holland & Barrett and the Puritan's Pride businesses also reflect our major investments in vertical integration over the last several years. The Nature's Bounty wholesale business continues to benefit from our strategy of offering our wholesale customers innovative new products for which we have found increasing demand based on the data we derive from the preferences of our retail customers in the U.S. and the U.K.

The plaintiffs allege that NBTY failed to disclose in the press release that its retail sector was weakening dramatically. In support of this assertion, the plaintiffs allege that Vitamin World store managers saw their customer base decline as a result of NBTY sharply raising its prices at those stores. In addition, NBTY terminated its popular "Super Tuesday" discount program, which offered 30% off sales on the first Tuesday of each month, in favor of a "Savings Passport" program, which required customers to register for the program; NBTY left store managers with low stocks of popular products interfering with store managers' ability to satisfy their regular customers thereby losing customers; low sales plagued the Nutrition Ware-

house, Dynamic Essentials and the SDV acquisitions causing "key personnel" to resign; NBTY decreased its advertising during the Class Period; and finally that NBTY took punitive action against underperforming retail stores' employees and managers thereby further damaging morale.

Immediately following the April 27, 2000 press release, Steven F. Taracevicz, an analyst from Wedbush Morgan, issued a "Buy" recommendation for NBTY's stock and John T. Mahoney, an analyst from Raymond James & Company, repeated his "Buy" recommendation of April 10, 2000. On April 28, 2000, Carole Buyers, an analyst from Tucker Anthony Cleary, issued a "Strong Buy" for NBTY's stock. On April 27, 2000, NBTY's stock rose $3.375 with intra-day trading volume of 4,873,000 shares to close at $18.125 from its previous day's close of $14.75.

On May 12, 2000, NBTY filed its quarterly Form 10–Q report for the second quarter of 2000. In this quarterly report, NBTY confirmed the financial information that it previously reported in its press releases. In addition, NBTY represented in the quarterly report that sales at stores open more than one year had increased 15.6%. However, NBTY allegedly failed to disclose that its financial condition was subject to risks and uncertainties associated with the fluctuations of the British Pound Sterling and that its customer base was shrinking.

On June 14, 2000, the price of NBTY's stock dropped $3.06375 to close at $11.06125 from its previous days close of $14.125. Neither immediately before nor during the drop in stock price was there any official news releases. On June 15, 2000, the last day of the Class Period, NBTY issued a press release announcing that:

[W]hile it is too early to assess total sales for its Vitamin World operations for the full third quarter ending June 30, 2000, same store sales for the two months of April and May 2000 were up 2%. For the full third quarter ending June 30, 1999 same store sales were up 11%. The Company has four separate channels of distribution: wholesale, direct response, Vitamin World retail operations in the United States and Holland & Barrett in the United Kingdom. It is also noted that the weakness in the pound sterling is currently expected to have a negative impact upon the Company's financial statement arising out of the operation of its Holland & Barrett stores in the United Kingdom. Results of operations for the third quarter ended June 30, 2000 are expected to be announced in early August, 2000.

On June 17, 2000, the price of NBTY's stock dropped $7.06375 to close at $7.06125 from the June 15, 2000 close of $14.125.

The plaintiffs allege that NBTY's stock traded at an artificially inflated price during the Class Period, namely January 27, 2000 through June 15, 2000. Further, the plaintiffs allege that the artificial inflation continued at least until the time NBTY admitted that it falsely reported revenues, income and earnings and this admission was digested by the securities market.

Next, the plaintiffs allege that during the Class Period NBTY failed to discuss known adverse trends in its reports filed with the SEC and its press releases as required under 17 C.F.R. § 229.303(a)(3)(ii). In particular, the plaintiffs allege that NBTY failed to disclose the following adverse trends: that sales at NBTY's Vitamin World stores were declining during the Class Period as demand for nutritional supplements weakened; that dramatic changes in sales promotions and price increases were lowering

profits by greatly diminishing sales revenues and causing customer attrition; that NBTY's export business continued to decline because of the difficulties in the United Kingdom market; that NBTY failed to derive any meaningful benefit from its "vertical integration" effort which involved the acquisition of nutritional supplement companies in different segments of the supplement business; and finally that NBTY's estimates, projections and opinions regarding its expected revenues, earnings, income and value of its stock lacked any reasonable basis.

### 3. The Stock Sales

The plaintiffs allege that the individual defendants and other insiders sold their NBTY stock during the Class Period after they inflated the price of NBTY's stock by failing to reveal adverse trends within the company. During the Class Period, the individual defendants allegedly made the following sales of NBTY stock: Arthur Rudolph sold 1,000,000 of his 2,056,893 shares or 48.6% of his shares; Scott Rudolph sold 1,600,000 of his 12,408,058 shares or 12.89% of his shares; Harvey Kamil sold 500,000 of his 2,281,432 shares or 21.91% of his shares. In 1999, the individual defendants did not sell any shares of NBTY stock.

Other purported insiders at NBTY allegedly made the following sales of NBTY stock during the Class Period: James P. Flaherty, Vice–President of Marketing, sold 35,000 of his 75,000 shares or 46.6% of his shares; William Shanahan, Vice–President of Data Processing, sold 40,000 shares of his 145,000 shares or 27.58% of his shares; Michael L. Ashner, a member of the Audit Committee, sold 20,000 of his 55,000 shares or 36.36% of his shares; Glen Cohen, a member of the Compensation Committee, sold all 87,000 shares that he owned; Bernard G. Owen, the Director,

sold 5,000 of his 44,400 shares or 11.26% of his shares; Nathan Rosenblatt, a member of the Audit Committee, sold all 30,000 shares that he owned. The plaintiffs allege that the total insider sales during the Class Period totaled $46,379,815.

Also, other purported insiders sought to liquidate their NBTY stocks. On or about January 31, 2000, Bernard G. Owens registered to sell 26,000 shares valued at $475,000. On or about February 18, 2000, Aram G. Garabedian, a member of the Audit Committee, registered to sell 6,000 shares of NBTY stock which consisted of 17% of his shares as of December 31, 1999. On or about May 1, 2000, Murray Daley, a member of the Board of Directors, registered to sell 13,000 shares which constituted 22.4% of his shares as of December 31, 1999. In or about May 2000, William J. Shanahan, Vice–President of Data Processing, registered to sell 60,000 shares which constituted more than 41% of his shares as of December 31, 1999.

The plaintiffs allege that the above stock sales were unusual and suspicious in timing and amount for the following reasons: the insider sales occurred shortly after NBTY issued materially false and misleading statements; four of NBTY's highly compensated executive officers sold significant amounts of NBTY stock during the Class Period; nine of the fourteen board members either sold or registered to sell their NBTY stock during the Class Period; no insiders made any sales of their stock in 1999; the individual defendants' 1998 sales proceeds were a small fraction of their sales proceeds during the Class Period; the combined insiders' 1998 sales proceeds were significantly less than the combined insiders' Class Period sales proceeds.

As noted in the procedural history, the plaintiffs filed the complaint on July 11, 2001. The complaint asserts two counts. Count one alleges that during the Class

Period the defendants artificially inflated the market price of NBTY stock by making materially false and misleading statements about its financial health in violation of section 10(b) of the Exchange Act and Rule 10b–5. Count two alleges that the individual defendants are liable as "control persons" for making the false and misleading statements about NBTY's financial health in violation of section 20(a) of the Exchange Act. The defendants now moves to dismiss the complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

In their motion, the defendants argue that the complaint should be dismissed because it alleges untrue and immaterial misrepresentations and omissions; fails to plead fraud with particularity; and fails to allege loss causation. In opposition, the plaintiffs contend that the complaint sufficiently alleges that during the Class Period the defendants failed to disclose in their reports filed with the SEC and their press releases several known adverse trends concerning sales which would soon dramatically effect the rate of revenue growth at NBTY. Also, the plaintiffs concede that the complaint is solely based upon these alleged misleading statements and omissions, not accounting fraud.

## II. DISCUSSION

### A. The Standard of Review

On a motion to dismiss for failure to state a claim, the Court should dismiss the complaint pursuant to Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle him to relief. *See King v. Simpson,* 189 F.3d 284, 286 (2d Cir.1999); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996); *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (holding that dismissal is inappropriate unless "it is clear

that no relief could be granted under any set of facts that could be proved consistent with the allegations"). The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *See Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). Indeed, it is not the Court's function to weigh the evidence that might be presented at trial; instead, the Court must merely determine whether the complaint itself is legally sufficient. *See Villager Pond,* 56 F.3d at 378. The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Koppel v. 4987 Corp.,* 167 F.3d 125, 127 (2d Cir.1999); *Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998).

In making this determination, the Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir.1999); *see Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir.2000) (holding that for the purpose of deciding a motion to dismiss, the complaint includes "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999). The Court also may consider documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit. *Rothman,* 220 F.3d at 97; *Cortec Industries, Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991). Further, in securities fraud actions, the Court may consider "public disclosure documents required by law to be and which actually have been filed with the SEC."

*Rothman,* 220 F.3d at 89 (citing *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991)); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.,* 75 F.3d 801, 808–09 (2d Cir.1996).

Rule 9(b) of the Federal Rules of Civil Procedure sets forth additional pleading requirements with respect to the allegations of fraud. In particular, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). But, under Rule 9(b), "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." *Id.* Securities fraud actions are subject to the requirements of Rule 9(b). *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir. 1994). However, the Private Securities Litigation Reform Act of 1995 (the "Reform Act") heightened Rule 9(b)'s requirement for pleading scienter. *See* 15 U.S.C. § 78u 4(b)(3)(A); *see also Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 537–38 (2d Cir.1999). As a result, in securities fraud actions, scienter may not be averred generally. Rather, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Press,* 166 F.3d at 538 (quoting 15 U.S.C. § 78u-4(b)(3)(A)); *see also Chill v. General Elec. Co.,* 101 F.3d 263, 268–69 (2d Cir.1996).

## B. The 1934 Exchange Act Claims

### 1. Section 10(b) and Rule 10b–5

Section 10(b) of the Exchange Act prohibits the use of "manipulative or deceptive" practices in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Rule 10b–5 sets forth specific practices that are considered "manipulative or deceptive." 17 C.F.R. § 240.10b5(b). Among other things, Rule 10b–5 provides that "[i]t shall be unlawful ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To state a claim under section 10(b) and Rule 10b–5, a plaintiff must allege that, in connection with the purchase or sale of securities: (1) the defendant made a false material representation or omitted to disclose material information; (2) the defendant acted with scienter; and (3) the plaintiff detrimentally relied upon the defendant's fraudulent acts. *See Press,* 166 F.3d at 534. As noted above, a plaintiff must allege elements one and two-fraudulent acts and scienter-with particularity in order to meet the heightened pleading requirements set forth in Rule 9(b) and the Reform Act. *See supra* Part II.A.

### a. The Misleading Statements and Material Omissions

The complaint alleges the following misleading statements and omissions:

(1) the defendants failed to disclose several known adverse trends effecting the financial health of NBTY in their reports filed with the SEC and their press releases during the Class Period, namely January 27, 2000 to June 15, 2000.

(2) the defendants failed to disclose in NBTY's April 27, 2000 press release that its retail sector was weakening dramatically.

(3) on May 12, 2000 the defendants failed to disclose in NBTY's quarterly Form 10–Q report for the second quarter that its financial condition was subject to risks and uncertainties associated with the fluctuations of the British Pound Sterling and that its customer base was declining.

(4) NBTY admitted in its June 15, 2000 press release that it falsely reported revenues, income and earnings during the Class Period.

### i. The Preliminary Requirements

The heightened pleading requirements for the first element of a securities fraud action, that the defendant made a false material representation or omitted to disclose material information, are codified in the Reform Act as follows:

In any private action arising under this chapter in which the plaintiff alleges ·that the defendant-(A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). The Second Circuit has interpreted Rule 9(b) and the Reform Act as requiring the complaint to "(1) specify the statements that the plaintiff contends were fraudulent, ·(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170; 1175 (2d Cir.1993)). *See also Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir. 1999) (quoting *Acito,* 47 F.3d at 51).

Each of the misleading statements and omissions alleged in the complaint were made in specifically identified financial disclosures or press releases discussing the financial disclosures. As such, the plaintiffs have satisfied the first three requirements. The remaining issue is whether the plaintiffs have sufficiently pleaded "why" the financial disclosures and press releases were fraudulent.

### a. The Known Adverse Trends

Under 17 C.F.R. § 229.303, promulgated by the SEC, the defendants were required to disclose on Form 10–Q any known trends that would have or were reasonably likely to have a material impact on net sales, revenues or income. 17 C.F.R. § 229.303(b). *See also In re Scholastic Corp. Securities Litig.,* 252 F.3d 63, 70 (2d Cir.2001). The plaintiffs must plead facts indicating that the alleged known trends existed at the time of the purported misleading statements or omissions. *See id.*

·*In re Scholastic* involved a securities fraud class action against a book publisher and one of its officers alleging that they, among other things, concealed a decline in sales and adverse book return figures causing shareholders to purchase its stock at an artificially inflated price. 252 F.3d at 67. The Second Circuit held that the complaint adequately alleged a trend in declining sales and an increase in book returns during the class period which ran from December 10, 1996 until February 20, 1997. *Id.* at 69–71. There, the complaint alleged in relevant part: specific data that showed the book publisher's sales through its distributors were declining just before the class period began and that the book publisher reviewed this data on either a daily or weekly basis; specific generated statistics by the book publisher showed declining retail sales; aggressive sales tactics by the publisher during the class period indicating that company officials were aware of declining sales and increased returns; and a $13,000,000 pretax charge taken by the book publisher

immediately after the class period indicating that the book publisher had knowledge of increased book returns. *Id.* at 72–73.

■ A review of each adverse trend in the within complaint indicates that *In re Scholastic's* factual background is distinguishable from this case. The adverse trends in the instant complaint do not allege specific data that shows NBTY's sales were declining either before or during the Class Period; do not allege specific generated statistics by NBTY that show declining retail sales either before or during the Class Period; and do not allege aggressive sales tactics by NBTY during the Class Period or a large pre-tax charge taken by NBTY immediately after the Class Period indicating that company officials were aware of adverse trends effecting net sales, revenues or income.

Rather, the adverse trends alleged in this complaint are conclusory. The first alleged adverse trend is that sales at NBTY's Vitamin World stores were declining during the Class Period as demand for nutritional supplements weakened. This conclusory allegation is not grounded in any supportive facts. *See San Leandro,* 75 F.3d at 812 (stating that conclusory allegations are insufficient to support alleged adverse sales); *Wexner v. First Manhattan Co.* 902 F.2d 169, 172 (2d Cir. 1990) (stating that claims of fraud must not be based on "speculation and conclusory allegations."); *Furman v. Sherwood,* 833 F.Supp. 408, 414 (S.D.N.Y.1993) (stating that the complaint offered no support for the conclusory allegation of "weak demand and a competitive price environment in the English Channel area … were causing results from the ferry and port units to be weak.").

A review of the complaint reveals the following as the only basis for the first adverse trend: an unnamed "seasoned" Vitamin World store manager noticed that a 10% decline in sales took place during the Class Period. This "seasoned" Vitamin World store manager made this conclusion based upon the result of increased prices, changes in advertising strategy, too many failed acquisitions and unqualified employees. Also, an unnamed part-time Vitamin World assistant manager reported that in January 2000, sales declined dramatically and her hours were cut by two-thirds and by February 2000, her hours were only 10% of what they were in 1999. This part time assistant manager stated further that after December 1999 there was a 20% to 33% drop in same-store sales from the year before and that for long periods of time popular items were on back order resulting in lost sales, customer attrition and damaged goodwill. Further, an unnamed sales associate of a Vitamin World distributor reported that between February and March 2000, she witnessed sales decline by approximately 26%. Finally, an unnamed Vitamin World second assistant sales manager confirmed that in early 2000, new marketing strategies had a negative impact on sales to senior citizen customers.

Measured against the supportive facts and statistics in *In re Scholastic* where the plaintiff set forth specific data from the defendant's distributors that showed sales were declining and set forth specific statistics generated by the defendant showing a decline in retail sales, aggressive sales tactics and a large pre-tax charge taken by the defendant, the first alleged adverse trend in the within complaint and its purported basis is conclusory and cannot support a securities fraud cause of action. *See In re Scholastic,* 252 F.3d at 72–73.

The second alleged adverse trend is that dramatic changes in sales promotions and price increases were lowering profits by greatly diminishing sales revenues and causing customer attrition. Again, this is

a conclusory allegation and is insufficient to plead fraud with the particularity required. *See San Leandro*, 75 F.3d at 812. A review of the complaint reveals the following facts in support of the second adverse trend: Several unnamed former employees reported that during the Class Period, sales of products were down sharply because of changes in advertising strategies and NBTY's steep price increases. An unnamed former district manager of an NBTY distributor reported that NBTY's 2000 announcement of 65% sales increase was "grossly exaggerated"; that other unnamed distribution managers expressed serious concerns about waning sales; and that there were product shortages in December 1999 that alienated regular customers and worsened an already depressed sales demand. Also, unnamed employees of Nutrition Warehouse, an NBTY acquired company, engaged in "massive walkouts" during the Class Period, which reduced the number of experienced employees and hurt sales. Further, an unnamed former Nutrition Warehouse customer service representative reported that price increases for NBTY's brands and the discontinuing of other more favored brands led to a 50% decline in customers and resignations. In addition, an unnamed former assistant sales manager for an NBTY distributor and a former second assistant manager for another distributor stated that in early 2000, NBTY's retail customers were extremely dissatisfied with the price increases resulting in a decline in sales.

The Court finds that these allegations are conclusory and insufficiently supported by facts. The "facts" alleged appear to be furnished by former unnamed employees of subsidiary companies owned by NBTY. The complaint does not allege any specific data from distributors that show diminished sales revenues or customer attrition during the Class Period. *Cf. Novak v.*

*Kasaks*, 216 F.3d 300, 312–313 (2d Cir. 2000) (noting the importance of identifying several documentary sources that support the basis that the defendant had serious inventory problems during the Class Period in adequately pleading fraud). As such, the complaint fails to allege a basis for the conclusion that price increases were lowering profits by greatly diminishing sales revenues and causing customer attrition. Accordingly, the second alleged adverse trend is also not sufficiently pleaded.

The third alleged adverse trend is that NBTY's export business continued to decline because of the difficulties in the United Kingdom market. A review of the complaint reveals that the only basis for this conclusion is the allegation that an unnamed former NBTY international researcher stated that NBTY made cutbacks in their export division towards the end of 1999. As such, the third adverse trend is also insufficient to support the cause of action.

The fourth alleged adverse trend is that NBTY failed to derive any meaningful benefit from its "vertical integration" effort which involved the acquisition of nutritional supplement companies in different segments of the supplement business. Again, the Court finds this allegation entirely vague and conclusory. *See San Leandro*, 75 F.3d at 812. The complaint does not adequately explain the "vertical integration" and does not allege any basis for the allegation that NBTY failed to derive any meaningful benefit from this effort. As such, this purported adverse trend does not aid the plaintiffs in pleading a cause of action.

The fifth and final alleged adverse trend is that NBTY's estimates, projections and opinions regarding its expected revenues, earnings, income and value of its stock lacked any reasonable basis. The

alleged projections and opinions in the complaint are as follows: (1) the defendants anticipate in January and April 2000 that Vitamin World sales would breakeven by the end of fiscal year 2000; (2) that the Rexall Sundown acquisition should have a positive impact on profitability; and (3) that NBTY is poised for growth in its Holland and Barrett and puritan.com e-commerce businesses. After the first and third statements, NBTY noted cautionary language advising investors that the statements related to future results. The Court finds these are optimistic future projections that do not purport to guarantee future outcomes; are not misleading; and cannot support a securities fraud cause of action. *See San Leandro*, 75 F.3d at 811 (noting that statements projecting continued growth and profitability reflect hope which cannot reasonably be found to be misleading). *See also Novak*, 216 F.3d at 315 (" '[S]tatements containing simple economic projections, statements of optimism, and other puffery are insufficient' to sustain a claim for securities fraud."). As such, the fifth adverse trend is not adequately pleaded.

Based upon the foregoing, the Court finds that the complaint does not adequately plead that "adverse trends" existed during the Class Period. Also, it therefore follows that the complaint fails to give adequate reasons why the statements in the reports filed with the SEC and the press releases during the Class Period were misleading. *See San Leandro*, 75 F.3d at 813 (stating that the plaintiffs failed to adequately plead fraud where there is no alleged circumstances indicating that any of the statements in the complaint were false).

**b. The April 27, 2000 Press Release**

■ The second alleged misleading statement, that NBTY failed to disclose in the April 27, 2000 press release that its retail sector was weakening dramatically, is also conclusory and insufficiently supported. A review of the complaint reveals that the basis of this conclusion is as follows: that unnamed Vitamin World store managers saw their customer base decline as a result of NBTY sharply raising its prices at its Vitamin World stores and terminating its popular "Super Tuesday" discount program, which offered 30% off sales on the first Tuesday of each month, in favor of a "Savings Passport" program, which required customers to register; that NBTY left store managers with low stocks of popular products interfering with store managers' ability to satisfy their regular customers and thereby losing customers; that low sales plagued the Nutrition Warehouse, Dynamic Essentials and the SDV acquisitions causing "key personnel" to resign; that NBTY decreased its advertising during the Class Period; and, finally, that NBTY took punitive action against underperforming retail stores' employees and managers thereby further damaging morale. As with the adverse trends, these allegations are conclusory and provide an insufficient pleading basis to support the allegation that NBTY's retail sector was weakening dramatically during the Class Period. *See San Leandro*, 75 F.3d at 812 (stating that conclusory allegations are insufficient to support alleged adverse sales). As such, the second alleged misleading statement is not sufficiently pleaded.

**c. The 10–Q Report for the Second Quarter of 2000**

■ The third alleged misleading statement is that the defendants failed to disclose in NBTY's quarterly Form 10–Q report for the second quarter of 2000 that its financial condition was subject to risks and uncertainties associated with the fluctuations of the British Pound Sterling and that its customer base was declining. This

allegation is also conclusory and insufficiently factually supported. The complaint alleges no basis to support the assertion that NBTY's customer base was declining before NBTY filed its 10–Q report on May 12, 2000. Also, NBTY has no obligation to advise investors that the fluctuation of the British Pound Sterling may effect its subsidiary in the United Kingdom. The effect of fluctuations in currency regarding NBTY's subsidiary in the United Kingdom, which would effect every company with a foreign subsidiary, is a situation that would be within the common knowledge of the average investor. *See Zerman v. Ball*, 735 F.2d 15, 21 (2d Cir.1984) (stating that liability does not arise for failure to disclose to an investor that she would have to put more money in her margin account if the market went down); *In re Ultimate Corp. Securities Litigation*, 1989 WL 79372, at *5 (S.D.N.Y.1989) ("Liability does not arise from the failure to disclose that which should be obvious to the average investor."). As such, the third alleged misleading statement is also not sufficiently pleaded.

### d. The June 15, 2000 Press Release

■ The fourth and final alleged misleading statement is that NBTY admitted in its June 15, 2000 press release that it falsely reported revenues, income and earnings during the Class Period. This allegation is totally without basis. At oral argument, counsel to the plaintiffs conceded that NBTY did not admit falsely reporting revenues, income and earnings in the June 15, 2000 press release. In the June 15, 2000 press release, NBTY simply announced that Vitamin World operations' same store sales for the first two months of the third quarter in 2000 showed sales up only 2% compared with 11% in the third quarter in 1999 and that the British Pound Sterling was expected to have a negative impact on NBTY's financial state-

ment arising out of its Holland & Barrett stores in the United Kingdom. As such, the fourth alleged misleading statement is totally erroneous and supports no cause of action.

Based upon the foregoing, the Court finds that the plaintiffs have not alleged circumstances indicating that any of the statements or omissions identified in the complaint were false or misleading and therefore they have failed to adequately plead fraud under Rule 9(b) and the Reform Act. Accordingly, the defendants' motion to dismiss for failure to plead fraud with particularity is granted. Because the plaintiffs have failed to plead fraud with particularity, it is not necessary to reach the defendants' remaining argument that the plaintiffs have failed to allege properly loss causation.

### 2. Section 20(a)

■ Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The plaintiffs seek to hold the individual defendants liable as control persons for the alleged misleading statements and omissions concerning NBTY's financial condition during the Class Period. To state a claim for control person liability under section 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the pri-

mary violator by the defendant; and (3) the controlling person's culpability in the primary violation. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998). Because the plaintiffs have failed to adequately allege a primary violation, namely a section 10(b) or Rule 10b–5 violation, their section 20(a) claim also must fail. *See Kalnit v. Eichler*, 85 F.Supp.2d 232, 246 (S.D.N.Y.1999).

### C. Leave to Amend

The plaintiffs have requested leave to amend any deficient claims in the complaint. Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a complaint "shall be freely granted when justice so requires." *See Cortec Indus., Inc.*, 949 F.2d at 48 ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."). The Court grants the plaintiffs leave to amend their complaint as to both claims within 30 days from the date of this order.

### III. CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED**, that the motion to dismiss the section 10(b) and Rule 10b–5 claim for failure to plead fraud with particularity under Rule 9(b) and the Reform Act is **GRANTED**; and it is further

**ORDERED**, that the motion to dismiss the section 20(a) claim for failure to state a claim is **GRANTED**, and it is further

**ORDERED**, that the plaintiffs are granted leave to file an amended consolidated class action complaint within 30 days of the date of this decision; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case within 30 days of the date of this decision if the plaintiffs

do not file an amended consolidated class action complaint.

**SO ORDERED**.